In re KING RESOURCES COMPANY SECURITIES LITIGATION.

Harold BOTTGER et al., Plaintiffs,

v.

KING RESOURCES COMPANY, a Maine Corporation, et al., Defendants.

Civ. A. No. C–3873.

United States District Court, D. Colorado.

Aug. 10, 1976.

Gerald L. Bader, Jr., Robert A. Dufty, Robert J. Dyer, III, Bader & Dufty, Denver, Colo., Eugene W. Landy, Landy & Spector, Eatontown, N. J., for plaintiffs.

John S. Pfeiffer, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for Charles A. Baer, Trustee of defendant King Resources Co.

Robert D. Inman, Timothy A. Correll, Inman, Flynn & Coffee, P.C., Denver, Colo., for William C. Lam, Trustee of defendant The Colorado Corp.

Philip G. Dufford, Welborn, Dufford, Cook & Brown, Denver, Colo., John A. Criswell, Criswell, Patterson & Ballantine, Englewood, Colo., for defendants Imperial-American limited partnerships and Theodore H. Frison, Trustee of Imperial-American Resources Fund.

James C. Bull, Quiat, Bucholtz & Bull, Denver, Colo., for defendants Royal Resources Corp., Royal Resources Exploration, Inc. and the Royal limited partnerships.

William G. Sumners, Jr., Denver, Colo., for defendants Denver Corp., Imperial-American Management Co. and Regency Management Co.

Harold Taft King, Denver, Colo., Edgar H. Brenner, Milton V. Freeman, Robert D. Rosenbaum, Rosalind C. Cohen, Scott B. Schreiber, Arnold & Porter, Neal A. Jackson, MacLeay, Lynch, Bernhard & Gregg, Washington, D.C., for defendant Ginsburg, Feldman & Bress.

Hardin Holmes, James C. Ruh, Ireland, Stapleton, Pryor & Holmes, Denver, Colo., for defendant Myer Feldman.

James E. Elliott, Jr., Jeffrey A. Hyman, Elliott & Greengard, Denver, Colo., Donald J. McLachlin, John M. Christian, Robert H. Wheeler, Isham, Lincoln & Beale, Richard J. Phelan, Chicago, Ill., for defendants Pe-

terson, Ross, Rall, Barber & Seidel and Herbert C. Loth, Jr.

H. Thomas Coghill, Coghill, Goodspeed & Roble, Denver, Colo., Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., for defendant Arthur Andersen & Co.

H. Clay Whitlow, Dawson, Nagel, Sherman & Howard, Denver, Colo., P. B. Konrad Knake, Jr., Peter B. Collins, Jeffrey B. Chase, White & Case, New York City, for defendant Arthur Young & Co.

Ernest W. Lohf, Paul F. Hultin, Lohf & Barnhill, Denver, Colo., for defendants Stanley C. Hope, J. L. Burke, Joseph J. Foss, Grover E. Murray, Arthur J. C. Underhill.

C. Henry Roath, Jay W. Enyart, Roath & Brega, Denver, Colo., for defendants Edward R. Annis, M.D., George C. Hardin, Jr., Marvin R. Barnett, Paul W. Fairchild, Charles R. McCoy and David E. Melendy.

Michael A. Sabian, Pendleton, Sabian, Guthery & Lewis, Denver, Colo., for defendant Walter M. Schirra, Jr.

John M. King, pro se.

William R. Fishman, Denver, Colo., for defendant Frank Eliot Sweetser.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING PARTIAL SETTLEMENTS

and

## MEMORANDUM OPINION AND ORDER AWARDING ATTORNEY FEES AND COSTS

FINESILVER, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING PARTIAL SETTLEMENTS

THIS MATTER came before the Court for hearing on June 14, 1976, pursuant to Notice to Plaintiffs, members of the plaintiff class ("the Bottger class"), and all defendants, to determine the fairness, reasonableness and adequacy of eight proposed partial settlements and compromises (agreements # 5 through # 12) in this action embodied in certain settlement agreements and introduced at said hearing. Preliminary approval was given to all eight such settlements by this Court's Order 1976–21 entered March 31, 1976, after hearings held on December 19, 1975, January 23, 1976, February 26, 1976, and March 1, 1976, the Court having received statements and evidence from plaintiffs and defendants on those occasions in support of such settlements. Order 1976–21, incorporated herein by reference, also specified the form of notice of these settlements to be sent to the class and published.

All but three (3) defendants (John M. King, Marvin R. Barnett and Edward R. Annis), out of the original 29 active defendants in this class action securities litigation have entered into various partial settlements as detailed in the Agreements on file with this court, specifically, Agreement # 1 between Plaintiffs, Theodore H. Frison, Trustee in Reorganization of Imperial-American Resources Fund, Inc. [IARF] and William C. Lam, Trustee for the Colorado Corporation; Agreement # 2 between Plaintiffs and Trustee Lam relating to Royal Resources Corporation [RRC]; Agreement # 3 between Plaintiffs, Trustee Frison and Trustee Lam relating to the "Hope Defendants"; and Agreement # 4 between Plaintiffs, Trustee Lam and Charles A. Baer, Trustee in Reorganization of the King Resources Company [KRC]; Agreement # 5 between Plaintiffs, Trustee Frison and Charles F. McCoy; Agreement # 6 between Plaintiffs, Trustee Frison and David E. Melendy; Agreement # 7 between Plaintiffs and George C. Hardin, Jr.; Agreement # 8 between Plaintiffs and Ginsburg, Feldman & Bress; Agreement # 9 between Plaintiffs, Trustee Frison and Myer Feldman; Agreement # 10 between Plaintiffs and Peterson, Ross, Rall, Barber & Seidel and Herbert C. Loth, Jr.; Agreement # 11 between Plaintiffs, Trustee Frison and Arthur Andersen & Co.; and Agreement # 12 between Plaintiffs, Trustee Frison and Arthur Young & Co.

A preliminary hearing was held on September 18 and 19, 1975, to determine if

there was probable cause to believe that proposed partial settlements # 1 through # 4 were fair, reasonable and adequate and to determine if the terms and conditions of those proposed settlements should be submitted to the members of the class. On October 23, 1975, this Court [Order 1975–45] granted preliminary approval to said proposed partial settlements and directed that the terms of Agreements # 1 through # 4 be submitted to members of the class for consideration. Following notice to members of the plaintiff class by mailing and publication in *The Wall Street Journal* (national edition) of November 6, 1975, a full and complete settlement hearing was held on December 19, 1975. At the conclusion of that hearing partial settlements # 1 through # 4 were approved by the Court as "fair, reasonable and adequate". Findings of Fact and Conclusions of Law Approving the Partial Settlements were formally entered on February 20, 1976. The proceedings are more fully described in that Order [Order 1976–14], which is incorporated herein by reference.

Subsequently, additional defendants entered into settlement agreements with the Bottger Class plaintiffs in this action. Defendants now settling with the class and to whom this Order finally approving settlements is directed are as follows: Charles F. McCoy (Settlement # 5); David E. Melendy (Settlement # 6); George C. Hardin, Jr. (Settlement # 7); Ginsburg, Feldman & Bress (Settlement # 8); Myer Feldman (Settlement # 9); Peterson, Ross, Rall, Barber & Seidel and Herbert C. Loth, Jr. (Settlement # 10); Arthur Andersen & Co. (Settlement # 11); and Arthur Young & Co. (Settlement # 12).

Pursuant to this Court's Order 1976–21, filed March 31, 1976, individual "Important Notices of Proposed Partial Settlements of Class Action" were mailed on April 16, 1976, to all class members whose names and addresses could be reasonably ascertained, as well as to all persons who had previously excluded themselves from the class, advising them of the terms of the eight instant settlements and that a final hearing would

be held on June 14, 1976, in the United States Courthouse, Denver, Colorado, to determine the fairness, reasonableness and adequacy of the terms and conditions of such settlements. The Notice also advised that the Court would consider the applications of plaintiffs' attorneys for an award of fees and expenses at a hearing to be held on June 14, 1976, in the United States Courthouse, Denver, Colorado, and stated the amount of awards requested. The Notice also stated where questions concerning the Notice, proposed settlements, and Proof of Claim form should be directed. In addition to the mailed Notice, a verbatim copy of the Notice was published on April 22, 1976, in the national edition of *The Wall Street Journal, The Denver Post* and *The Rocky Mountain News.*

█ The Court finds that the Notice is neither defective nor misleading but fairly states the terms and conditions of the eight settlements and gives proper and sufficient notice of the hearing and of other actions connected with these settlements. The Court expressly finds that the above Notice satisfies the requirements of Rules 23(e) and 23.1 and the requirements of due process.

Pursuant to Order 1976–21 of this Court, Proof of Claim forms were sent out together with the Settlement Notices to the same persons who received such Notices, as above stated. Such Proof of Claim forms contained instructions on how they should be filled out, as well as a self-addressed return envelope for mailing such Proofs of Claim. The Court finds these Proof of Claim forms and their service on members of the class to be sufficient to satisfy due process requirements and Rules 23(e) and 23.1. It was also stated in such Proof of Claim forms that previous filing of the Proof of Claim form sent out with the earlier Notice of Settlements would suffice for a sharing in the instant settlement proceeds.

The Court now having considered the testimony, affidavits, depositions, exhibits, transcripts of other hearings before this Court, and arguments submitted in connection with the settlement agreements; the

Court having heard from all interested persons who appeared at the hearing, or who made written submissions to the Court; the Court having received no objections whatsoever to the settlements in written or oral form by any member of the class or any other defendant; and the court being fully advised in the premises, the Court makes the following findings of fact and conclusions of law which shall constitute the findings of fact and conclusions of law in support of the Final Judgment approving such settlements filed June 14, 1976, required by Rule 52, Federal Rules of Civil Procedure:

## SUMMARY OF THE LITIGATION

### PLAINTIFFS' CLAIMS

During the period September, 1966, through August, 1970, over $130,000,000 worth of Imperial-American Resources Fund, Inc. (IARF) and Royal Resources Exploration Fund, Inc. (RRE) limited partnership interests in oil and gas development properties, after having been registered with the United States Securities and Exchange Commission and the appropriate state securities commissions, were offered and sold to the public.

Plaintiffs, individually and as representatives of a class of some 17,000 investors in the twenty-four (24) limited partnerships, brought suit against the offerors, IARF and RRE, and other individuals, corporations and partnerships allegedly involved as conspirators or aiders and abettors in a scheme to defraud the plaintiffs. Additionally, plaintiffs sued in a derivative capacity on behalf of some of the partnerships. Named as defendants in this action were approximately thirty (30) separate individuals and entities.

This extremely complex litigation originally included both a direct (class) action and a derivative shareholders action. In the direct (class) action plaintiffs asserted violations of Section 11, 12(2) and 17 of the Securities Act of 1933 and Section 10 of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, breach of fiduciary duties, actual and constructive fraud, misrepresentation both by state-ments and omissions, and other common law wrongs.

Imperial-American Resources Fund, Inc. was a general partner in sixteen (16) of the partnerships named in the complaint, and Royal Resources Exploration Fund, Inc. was a general partner in eleven (11) others. Included among the defendants named in the suit were the directors of both of these general partners, the lawyers and accountants to the offerors and related and affiliated entities, including John M. King and King Resources Company (KRC).

The defendants can be grouped into several categories, First, plaintiffs named as defendants the limited partnerships, the general partners, and the companies which managed the general partners, Royal Resources Corporation and Imperial-American Management Company. The Denver Corporation, underwriter for the limited partnerships, and the Colorado Corporation, parent company for the general partners, the management companies, and the underwriter, were also defendants. Various directors and officers of the general partners, the attorneys for the partnerships and the accountant for the partnerships, Arthur Young & Co. were joined as defendants. Finally, plaintiffs sought to establish the liability of John M. King (majority shareholder of the Colorado Corporation), King Resources Company, (also controlled by King at times relevant to this action) and Arthur Andersen & Co., (accountants for The Colorado Corporation and King Resources Company).

The class of limited partner investors represented by plaintiffs numbered more than 17,000, and the amount of money invested by class members during the relevant period was in excess of $130,000,000.

The original complaint was filed on January 20, 1971, in the United States District Court for the District of New Jersey. Upon motion for a change of venue by some of the defendants, Judge George H. Barlow transferred the case to this district on March 20, 1972. The case was transferred pursuant to 28 U.S.C. § 1404(a) which pro-

vides that a district court may transfer a civil action to any district where it might have been brought to serve the convenience of parties and witnesses. The case was assigned to this Court in conjunction with the concommitant assignment here of the King Resources Company Securities Litigation (M.D.L. Docket No. MDL 79–1) by the Judicial Panel on Multi-District Litigation.

The Second Amended Complaint, as supplemented by particularization of claims and various schedules filed by plaintiffs, centers around recitals in several prospectuses filed by defendants. The claims set forth in the Second Amended Complaint were denied by defendants, and all phases of the case as described herein were vigorously contested by defendants.

As subsequently amended and made more definite during pretrial proceedings, plaintiffs' principal claims were that plaintiffs, and the class they represent, were defrauded as a result of defendants' alleged violations of §§ 11 and 12(2) of the Securities Act of 1933 and § 10(b) and Rule 10(b)–5 promulgated thereunder of the Securities Exchange Act of 1934. More specifically, plaintiffs claimed that during the period 1966 through 1970, certain defendants sold interests in IARF and RRE limited partnerships to the public, which partnerships were engaged in the business of oil and gas exploration and development, by means of prospectuses and registration statements containing material misrepresentations and omissions.

Plaintiffs alleged that they purchased their partnership interests as a result of the false and misleading information contained in the prospectuses and registration statements. The original complaint charged that the interests were sold in violation of Sections 11, 12, 15, and 17 of the Securities Act of 1933 as well as Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5.

Plaintiffs contended that defendants conspired to defraud investors and in particular that false prospectuses and registration statements were part of this scheme.

Plaintiffs further contended that some of the defendants committed acts of waste and mismanagement in handling the affairs of the partnerships. These acts allegedly constituted violations of common law fiduciary duties to the entities. The charges of breach of fiduciary duties were directed against the general partners, the management companies, and certain officers, directors and other persons.

Plaintiffs sought rescission, money damages, injunctive relief, cancellation of the Net Operating Profits Interests (NOPI), allegedly earned by certain of the defendants, and an accounting.

Originally the class asserted derivative claims on behalf of the IARF and RRE limited partnerships, claiming alleged violations by certain defendants of fiduciary duties to those limited partnerships. On July 25, 1972, this Court granted the motion of Theodore H. Frison, Trustee in Reorganization of IARF, to intervene in this action for the purpose of seeking an order staying the instant proceedings pending instructions to Trustee Frison from the Bankruptcy Court. Ultimately, through a series of Orders from this Court, this litigation was abated until approximately March of 1974. Partial stays emanating from the various Bankruptcy Courts continued and still continue to affect the progress of this case. At various times during this litigation the respective courts were petitioned for relief or partial relief from the stays. Throughout the preparation for trial of this suit, counsel were required to file periodic reports on the status of various Bankruptcy proceedings.[1]

Imperial-American Resources Fund, Inc. was named as an original defendant in this case prior to filing the Chapter X petition. As noted, IARF was the common general partner of the sixteen (16) IARF limited partnerships named in the complaint. That corporation is presently the debtor in a proceeding for reorganization under Chapter X of the Bankruptcy Act. The Trustee in the

---

**1.** See Section *infra* on *Related Litigation*.

Chapter X proceeding was eventually granted leave to intervene as a defendant in this action for all purposes and to file a cross-complaint asserting claims against some of the other defendants in this action.

The Court also granted exclusive control of the IARF derivative claims to Trustee Frison. The derivative claims asserted on behalf of Frison, generally alleged that certain of the defendants mismanaged the assets of IARF and of its partnerships, and committed breaches of their fiduciary duties. The NOPI itself was a subject of claims filed by one of the defendants, Imperial-American Management Company (IAMC) in the IARF reorganization proceedings where IAMC sought to have past and future NOPI paid to it. Frison asserted various defenses and set-offs to IAMC's claims, primarily seeking a declaration of invalidity of NOPI.

## CERTIFICATION OF CLASS ACTION

By Order dated September 4, 1974, the Court certified this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, the class consisting of all purchasers of interests in IARF limited partnerships 1967–2, 1967–3, 1967–4, 1968–1, 1968–2, 1968–3, 1968–4, 1969–1, 1969–2, 1969–3, 1969–4, 1970–1, 1970–2 and 1970–3, and RRE limited partnerships 1967–4, 1968–1, 1968–2, 1968–3, 1968–4, 1970–1 and 1970–2, including those investors who had sold or transferred their interests in the interim.

Among the considerations which entered into the determination as to whether the litigation should proceed as a class action were the requirements spelled out in Rule 23(a), Fed.R.Civ.P., which provide that a case may be brought as a class action if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the formal parties are typical of those of the class, and (4) the representative parties will fairly and adequately represent the members of the class.

In addition, since plaintiffs sought class certification under Rule 23(b)(3), they had to show that common questions of law or fact predominated over individual questions, and that the class action device was superior to other available methods of resolving the controversy. Throughout this phase of the litigation defendants vigorously contested the certification of the class and objected to allowance of the derivative claims.

Defendants asserted various conflicts of interest among the limited partners and the various partnerships. Defendants argued that since the plaintiffs bought the partnership interests at different times, different registration statements, prospectuses and representations would be relevant to some plaintiffs but not to others. Likewise, affirmative defenses would differ among plaintiffs and different evidence would apply to statutes of limitations. Defendants asserted that the variations in the success or failure of the different partnerships would result in the desirability of varying remedies and hence conflicts of interest would arise from class certification. Additionally, the potential that co-mingling of assets or transactions between partnerships would be revealed by the evidence raised the possibility that cross-claims would arise between the plaintiffs.

These contentions were vigorously advanced by defendants. While we gave each argument careful consideration, our view of the factual backdrop of the litigation and the prevailing legal authority, *see Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968); *Harris v. Palm Springs Alpine Estate, Inc.* 329 F.2d 909 (9th Cir. 1964); *Fischer v. Kletz,* 41 F.R.D. 377, 381 (S.D.N.Y.1966); *Mersay v. First Republic Corporation of America,* 43 F.R.D. 465, 471 (S.D.N.Y.1968), persuaded us that class certification was appropriate. In our view the common issues were clearly predominant and the class action device was superior to other alternatives for management of the litigation.

Subsequently, a motion for certification for an appeal pursuant to 28 U.S.C. § 1292(b) was denied by this Court. An

interlocutory appeal however was taken to the Tenth Circuit Court of Appeals by certain defendants from our Order certifying the class.

The Tenth Circuit denied a motion by appellants to stay sending the notice of pendency of class action pending disposition of the appeal (December 17, 1974). Likewise, the appellate court declined to stay all district court action pending appeal. Ultimately, the Court of Appeals dismissed the appeal from class action determination as premature. *Royal Resources Corporation v. Bottger*, 525 F.2d 211 (10th Cir. 1975).

At various points throughout the litigation the Court gave consideration to the possible definition and certification of certain subclasses. The advisability and propriety of this procedure was recommended by various defendants and continued to surface throughout the remaining pretrial procedures. It was urged to this Court even on the eve of trial and was included among the issues presented to the Tenth Circuit Court of Appeals on the appeal from class action certification.

Likewise, the overlap of the class in this suit with the shareholders of IARF in the Reorganization Court remained of concern to this Court. Prior to certification of the class here, counsel for the plaintiffs in *Bottger* specially represented the Chapter X Trustee of IARF in his claims against certain defendants in this case. Claims of conflict of interest were raised and were considered in both the Reorganization Court and this Court. Ultimately, plaintiffs' counsel withdrew from representation of Trustee Frison.

After our decision that this case should proceed as a class action the Court and counsel began the laborious process of preparing a fair and adequate notice of a pendency of the class action. Drafts were submitted and counsel for some of the defendants filed and argued numerous objections to the proposed forms of Notice. Eventually, a Notice of the pendency of the class action was personally served on all known potential class members on December 29, 1974, and published twice in the national edition of the *Wall Street Journal* on January 6 and January 8, 1975. Of the 16,604 notices that were mailed to potential investors 1,263 were returned as undeliverable and 1,319 persons requested exclusion from the class.

Additional issues regarding the class action procedure arose in connection with permissible communications with the members of the class by counsel for plaintiffs as well as defendants, and other areas requiring attention of counsel and the Court.

## DERIVATIVE ACTION

In addition to the direct class action, plaintiffs brought suit as a derivative action on behalf of the sixteen (16) IARF and eleven (11) RRE partnerships named as plaintiffs in the complaint. In the derivative action plaintiffs asserted violations of fiduciary, contractual and other duties of defendants. Since the general partner of the Imperial partnerships was the debtor corporation in a Chapter X bankruptcy proceeding, the Chapter X Trustee was granted leave to intervene in this suit to, *inter alia*, pursue those claims in the name of the partnerships of which Imperial was a general partner. As to the eleven (11) RRE partnerships, however, plaintiffs sought approval for a derivative action.

Defendants alleged a conflict of interest in the instant case in urging disapproval of the derivative action on the ground that plaintiffs were suing partnerships on direct class action claims and simultaneously suing derivatively on behalf of the same partnerships.

We eventually determined that there was no inherent or actual conflict in bringing this action both as a class action and a derivative action. See *Herpich v. Wallace*, 430 F.2d 792, 807 (5th Cir. 1970); *Berman v. Thompson*, 45 F.R.D. 342 (N.D.Ill.1968); *Heilbrunn v. Hanover Equities Corp.*, 259 F.Supp. 936 (D.C.N.Y.1966).

We accordingly held that plaintiffs could bring the suit derivatively on behalf of the nine Royal Resources partnerships in which plaintiffs held an interest. See *Kauffman*

*v. Dreyfus, Inc.*, 434 F.2d 727 (3rd Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

The Court later ruled that all claims based on state statutory and common law had been withdrawn, including derivative claims so situated. Plaintiffs persistently contested the ruling of the Court. In any event, the derivative claims were expressly bifurcated from the direct class action for purposes of the trial.

### DISCOVERY

From the outset of this litigation the case has been vigorously pressed by plaintiffs and vigorously opposed by defendants. Discovery was extensive and extended throughout the United States. During the latter part of 1974 and throughout 1975 discovery issues were at the forefront of this litigation. At least fifty (50) depositions were taken by all parties and extensive travel and preparation were involved. The interrogatories and formal as well as informal requests for documents were massive, estimated by some counsel to reach into the tens of thousands.

Discovery was confounded in this case by the criminal indictment (in another jurisdiction) of a defendant in this suit and other principals of the King Resources financial complex. Issues of self-incrimination arose in regard to the production and authentication of certain documents and other discovery difficulties consequently resulted.

Inspection of corporation records and files was complicated by the massive volume of records available and the financial difficulty facing many of the King Resources enterprises.

Claims of attorney-client and work product privilege necessitated numerous rulings by the Court, some after *in camera* review of the documents in question. The Court was called upon also to rule upon the applicability of Colorado's accountant-client privilege.

Because this Court had the instant case as well as other Multi-District Litigation and other judges on this district had other pending litigation regarding King Resources and affiliates, it was not possible to harmonize discovery efforts.

In addition, the interests and concerns of the fiduciaries in this Court were not always the same as their concerns in the other Courts.

### RULINGS ON DOCUMENTS

As the trial date approached, counsel became increasingly aware that the documents located and analyzed during the discovery phase would be the crux of plaintiffs' case to the jury. Originally, counsel for plaintiffs identified nearly 2,000 separate documentary exhibits to be introduced at trial. Accordingly, a myriad of issues concerning the identification, authenticity and admissibility of the documents occupied hundreds of hours for counsel and the Court. Objections to the admissibility of documents and exhibits were filed by the volume and counsel sought appointment of a special master to supervise hearings on admissibility of the massive documentary evidence. The request for appointment of a master was rejected by this Court. Subsequently, several full day hearings were conducted by the Court prior to trial in an effort to establish some threshold guidelines for identification, authentication, and admissibility of documents. In all, hundreds of documents were reviewed in open Court with counsel and separate rulings were issued as to authentication and identification.

Coloring all concerns about documentary evidence was the overriding issue of defendants' alleged conspiracy and aiding and abetting. Because of these allegations certain evidence was admissible against some, but not all, defendants.

Controversy arose over the applications of the shop book rule under the Federal Rules of Evidence and the use of a limiting instruction for the jury. *See Lowther v. United States*, 455 F.2d 657 (10th Cir. 1972).

## PLEADINGS AND MOTIONS

Throughout the litigation, the viability of plaintiffs' 1933 Act claims was contested. The Court eventually determined, on motions by defendants for summary judgment, that the claims brought under the Securities Act of 1933 were to be dismissed, some on grounds of expiration of statutes of limitations. The motions were extensively briefed and accompanying affidavits and exhibits were voluminous.

Defendants' motions to dismiss certain claims under 15 U.S.C. § 77k and 77l were granted early in the litigation for failure of plaintiffs to plead compliance with the applicable statute of limitations. Plaintiffs were granted leave to file an amended complaint within thirty (30) days to affirmatively plead compliance. Such an amendment to the complaint was filed. Another issue regarding 15 U.S.C. § 77m arose in regard to the three-year statute of limitations. We granted summary judgment to defendants on all claims arising three years before the date of the complaint on the grounds that the equitable doctrine of fraudulent concealment does not toll the three-year statute in 15 U.S.C. § 77m.

Other motions for summary judgment, for judgment on the pleadings, and other legal rulings were extensively briefed and argued. Throughout the litigation extensions of time were sought—some were vigorously opposed. Also, counsel were withdrawn and/or substituted. The docket entries in this action now total in excess of 2,150 separate items.

During the course of this litigation, the applicable legal principles were undergoing remarkable change and were subject to differing interpretations. Our research revealed numerous pertinent cases decided and pending in other jurisdictions. *See e. g. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975); *Clegg v. Conk,* 507 F.2d 1351 (10th Cir. 1974), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975);

*Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731 (10th Cir. 1974).

## RELATED LITIGATION

The litigation in this District involving John King and King's former financial holdings presented enormous and complex problems of judicial management. The Courts were faced with the challenge of safeguarding the rights of literally thousands of persons, both claimants and defendants. At the same time we moved to resolve these complex and multifaceted disputes once and for all without exhausting a disproportionate share of available judicial resources.

This court was concerned with numerous cases in which plaintiffs have alleged various types of securities fraud. This Court had six cases on its docket brought by parties who averred fraud in the sale of common stock and debentures of King Resources Co. The lead case in this group was *The Dietrich Corporation v. King Resources Co.* No. C–3424. However, five other cases, *Gross v. Blythe Co.,* No. C–3979, *Morell v. King, et al.,* No. C–3980, *Hill, et al. v. Arthur Andersen & Co., et al.,* No. C–4485, *Pyle v. Arthur Andersen & Co., et al.,* No. C–4486 and *Licker v. King Resources Company, et al.,* No. C–3981, involved similar securities fraud issues. The latter five cases were transferred to this Court by the Judicial Panel on Multidistrict Litigation for pretrial procedures.

In addition, the Court had three cases in which plaintiffs sought recovery for the fraudulent sale of various debt securities by the King Resources Company. These cases are *Ohio v. Crofters,* No. C–4628; *Ohio v. Boucher,* No. 75–F–573; and *First Nat'l Bank v. King Resources Co.,* No. C–5045. This Court also managed six cases brought by Arthur Andersen & Company for indemnity and contribution against co-defendants in the cases in which that firm is a party.

Related cases occupied the time and resources of other Courts of the district. Chief Judge Alfred A. Arraj presided over a recission action brought by American Em-

ployers' Liability Insurance Company seeking recission of a Directors' and Officers' Insurance policy issued to King Resources Company, *American Employers' Ins. Co. v. King Resources Co., et al.*, No. C–3908. All potential claimants against the policy were included in the proposed class of defendants in that case. In addition, Judge Fred M. Winner was assigned to the reorganization proceedings involving King Resources Co., *In the Matter of King Resources Company and International Resources Limited*, Debtor, No. 71–B–2921 and 72–B–644, and Imperial-American Resources Fund, Inc., *In the Matter of Imperial-American Resources Fund, Inc.*, Debtor, No. 72–B–556; and Judge Richard P. Matsch had responsibility for the bankruptcies of John M. King, *In the Matter of John M. King*, Bankrupt No. 71–B–1630; and The Colorado Corporation, *In the Matter of The Colorado Corporation*, Bankrupt No. 71–B–1216.

Three of the defendants in the instant case remained subject to stay orders issued in various proceedings under the Bankruptcy Act. Lawsuits were stayed against John M. King by Order of the Court in arrangement proceeding No. 71–B–1630, and against King Resources Company by Order of the Reorganization Court in proceedings numbered 71–B–2921 and 72–B–644. Also, the Bankruptcy Court in No. 71–B–1216 stayed suits against The Colorado Corporation. Related cases before other Courts include: *McNeish v. Royal Resources Exploration, Inc.*, No. 22164, in the District Court In and For the County of Adams, State of Colorado; *Erwin, et al., v. Imperial-American Resources Fund, Inc., et al.*, No. 74–H–447, in the United States District Court for the Southern District of Texas, Houston Division. Motions to intervene by the plaintiffs in the state court litigation were denied by this Court.

### PREPARATION FOR TRIAL

By the date of trial, set to commence February 23, 1976, all claims of plaintiffs except the 10b–5 claims had been dismissed by the Court or withdrawn by plaintiffs. As noted, all dismissals were vigorously contested by plaintiffs' counsel.

Motions for separate trials were filed by various defendants on a variety of grounds until just days before the commencement of trial.

Among other concerns, the Court asked that counsel consider appointment by the Court of an additional expert witness. Counsel briefed the issue thoroughly and eventually the Court determined that appointed expert(s) would not be utilized.

Numerous parties had submitted demands for jury trial. Proposed *voir dire* questions, proposed instructions, and extensive trial briefs were submitted. The Court entered orders regarding the exercise of peremptory challenges and had instructed counsel on procedural matters such as the length and order of opening statements.

Shortly before trial and at the suggestion of the Court, plaintiffs filed certain motions *in limine* which focused the attention of the Court and counsel on the issues of measurement of damages and possible tax implications in this suit. Although the Court declined to rule *in limine* on the issues raised, we nevertheless are of the view that these pleadings isolated some of the most provocative legal issues which arose in this complex 10b–5 action.

Additional issues with which counsel and the Court were concerned prior to trial were the questions of knowledge and reliance. The instant suit was unlike many other securities cases in that the interests involved were not readily traded on any exchange. Also, we were hampered at this stage of the litigation by a marked paucity of 10b–5 jury cases.

On the eve of trial, certain defendants filed a Petition for a Writ of Prohibition in the Tenth Circuit Court of Appeals, primarily appealing the approval by this Court of the first four settlements in this litigation (November 21, 1975). Non-settling defendants had vigorously protested the approval of settlements # 1 through # 4 and opposed the Notice sent to the class members regarding the settlements. Some defendants sought to conduct additional discovery on the issue of the Notice alone.

The Writ of Prohibition was denied by the Tenth Circuit (January 20, 1976). The Court nevertheless continued to consider issues related to the first four settlements, such as the treatment of the settlements at the upcoming trial and the proper allocation of proceeds from the settlements.

We note specifically in this regard that the Entry of Judgment approving settlements # 5 through # 12 (June 14, 1976) has resulted in the dismissal of all pending appeals except those of defendant John M. King. The appeal of John M. King from orders denying consolidation in this District of the pending King Resources litigation and from approvals given by these Courts to settlements in the various cases remains viable in the Tenth Circuit. No. 75–1886.

From time to time throughout the years of litigation, the parties met and explored the possibilities of settlement of the action, in some instances at the Court's direction. Such negotiations produced the original four settlements (# 1 through # 4), given final approval in this Court's Order 1976–14 and on the virtual eve of trial (then scheduled for February 23, 1976) culminated in settlements # 5 through # 12 which are the subject of this Order. By agreeing to such settlements, these settling defendants do not admit, and on the contrary, expressly deny, that they violated any provisions of federal or state law.

The following defendants have previously agreed to settlement terms with the class, and this Court has previously given final approval to such settlements in this Court's Order 1976–14: Trustee Frison; William C. Lam, Trustee for the Bankrupt, The Colorado Corporation and for certain of its subsidiaries (The Denver Corporation, IAMC, RRC, RRE, and Regency Management Corporation); Charles A. Baer, Trustee in Reorganization of King Resources Company; Paul W. Fairchild; Stanley C. Hope; Walter M. Schirra, Jr.; Arthur J. C. Underhill; Joseph J. Foss; J. L. Burke; and Grover Murray. All defendants in this action, including those defendants now settling and those who have previously settled with the class, asserted a number of legal and equitable defenses to the class' and trustee's claims. All such defendants continue to deny all claims of the class and all cross-claims of Trustee Frison and have denied and continue to deny all allegations of wrongdoing.

## THE SETTLEMENTS

The twelve partial settlement agreements provide, subject to the necessary Court approvals (all of which have been obtained) as follows:

(1) *Settlement # 1—The Class—Frison—Lam Settlements.* Under the terms of this Agreement and the Conditional Allocation Agreement between Frison and the *Bottger* Class, the class receives 12½% of the IARF estate, the evidence before the Court being that the net value of this estate is approximately $76,000,000, or $9,500,000 to the Class. William C. Lam, Trustee for The Colorado Corporation, in return for the payment to him of $3,800,000 by Frison, withdrew certain claims in the IARF proceedings to the Net Operating Profit Interests (NOPI) allegedly owned by Imperial-American Management Company (IAMC), a wholly owned subsidiary of The Colorado Corporation. The Agreement settles the claims between the parties, including certain claims asserted by Frison against Lam, the net effect of which is to enhance the IARF estate, a portion of which is to be received by the *Bottger* Class. The estimated present worth of the NOPI, discounted at nine percent (9%), is in excess of $15,000,000; the estimated value of the remaining properties, as opposed to the estate, as a result of this settlement, is in excess of $5,400,000.

(2) *Settlement # 2—The Class, Lam Agreement.* This Agreement relates to the settlement of the claims against RRC and RRE, the management company and general partner of the Royal partnerships. In return for payment of the sum of $500,000 by the *Bottger* Class (payment to come from monies earned by RRC subsequent to July 1, 1975), the *Bottger* Class, through the University National Bank, a nominee appointed by this Court, has received the

stock of RRC whose principal asset is the NOPI having an estimated future net revenue of $1,465,747 and a present worth of $1,025,317. Also the Court is advised that NOPI proceeds from sales of properties and from oil revenues through June 14, 1976, were somewhere between $680,000 and $585,000, depending on what expenses were properly allocable against those sales revenues. The class, therefore, will net somewhere between $1,100,000 and $1,600,000 (after payment of $500,000 [plus interest thereon of $37,500 paid to Trustee Lam but less $62,500, plus interest of $4,687, allocated to NOPI recovered for RRE 1968–4 which is the subject of our Order 1976–38 entered this date] for RRC stock and including $206,000 to be paid to RRE 1968–4). In addition, class counsel filed their Proof of Claim in the estate of The Colorado Corporation for repayment of certain funds taken by The Colorado Corporation from certain Royal partnerships, which funds totalled $693,000. The Court is advised that The Hon. John F. McGrath, on July 13, 1976, entered his Order approving payment to the *Bottger* Class of $760,842.20 as an expense of administration. The total benefit to the class of Settlement # 2, then, is approximately $2,060,000. Also, class counsel obtained cancellation of a claim of The Colorado Corporation against RRC for $1,100,-000.

(3) *Settlement # 3—The Class, Frison, "Hope Defendants" Agreement.* This Agreement between the *Bottger* Class, Frison and Defendants Stanley C. Hope, J. L. Burke, Joseph J. Foss, Grover E. Murray, Arthur J. C. Underhill, Walter M. Schirra, Jr., and Paul W. Fairchild provides for payment to Frison and to the *Bottger* Class of the sum of $82,500 cash plus assignment of various interests in the RRE and IARF limited partnerships and parallel funds. The evidence adduced at the hearings is that the interests assigned have a present worth of approximately $12,855, of which amount, after adjustments between Frison and the *Bottger* Class, result in payment to the class of a total of $63,086. This Agreement provides for dismissal without prejudice of all claims between the parties, in-

cluding any crossclaims that may have been asserted and includes assignment of any rights that the settling defendants may have under the insurance policy in issue in the case of *Royal Resources Corporation v. American Employers' Insurance Company,* Civil Action No. 75–F–1143.

(4) *Settlement # 4—The Class, Lam, Baer Agreement.* With regard to Settlement # 4, class counsel achieved the cancellation of certain claims in excess of $1.9 million against RRC, making Settlement # 2 of much greater actual benefit to the class. In addition, counsel were able to exchange eight limited partnership interests in the "Midbar" venture, which partnership interests were assessable for further costs, for four paid-up interests. A copy of the Midbar agreement has been filed with this Court, and its execution by class counsel approved by Order 1976–26. Class counsel have reserved the right to apply for fees as funds are received from this venture. At present, class counsel have requested no fees from this settlement; the Notice sent out on October 29, 1975, specifically provided that class counsel are entitled to apply for and receive such reasonable allowances for their legal services and out-of-pocket disbursements in connection with this litigation as the Court might order.

As noted, the Court has given final approval to settlements # 1 through # 4 in our Order # 1976–14, incorporated herein by reference. The following eight (8) settlements are the subject of this Order and our Final Judgment entered June 14, 1976.

(5) *Settlement # 5—The Class-Frison-McCoy Agreement.* By the terms of this settlement, Charles F. McCoy agreed to pay and has paid to the class and Frison $25,000 in cash, and assign to the class and Frison all interests owned by him in either IARF or RRE, together with all rights he might possess under the directors and officers insurance policies issued by American Employers. In consideration of such payments and assignments, the class and Frison agreed to dismiss without prejudice all claims they might have against McCoy; $9,375, or 37½% of $25,000 is to be paid over

to Frison. The class retains all of McCoy's Royal interests and 50% of the IARF interests assigned by McCoy. The present worth of the IARF and RRE interests assigned by McCoy to the class is $4,558.

(6) *Settlement # 6—The Class-Frison-Melendy Agreement.* By the terms of this settlement, David E. Melendy agreed to pay and has paid to the class and Frison $5,000 in cash, and to assign to the class and Frison all his interests in IARF or RRE as well as all claims he might have under the directors and officers insurance policies issued by American Employers. Additionally, as part of the settlement Melendy stipulated to the entry of a judgment against him in the amount of $6,000,000, to be satisfied from any proceeds from his claim against American Employers' Insurance Co. In consideration of such undertakings by Melendy, the class and Frison agreed to dismiss without prejudice all claims they might possess against Melendy. Frison is to receive $1,875 or 37½% of the $5,000 plus 50% of the IARF interests assigned by Melendy. Frison does not share in any proceeds from the judgment obtained against Melendy. Melendy's partnership interests benefitting the class are valued at $256.00.

(7) *Settlement # 7—The Class-Hardin Agreement.* By the terms of this settlement, George C. Hardin, Jr. agreed to pay and has paid to the class $30,000, and has assigned to the class all of his interests in either IARF or RRE, having a present worth of $4,918, as well as all claims he might possess under the directors and officers insurance policies issued by American Employers' Insurance Company. In consideration of such payments and assignments by Hardin, the class agreed to dismiss without prejudice all claims made by it against Hardin.

(8) *Settlement # 8—The Class-Ginsburg, Feldman & Bress Agreement.* By the terms of this agreement, Ginsburg, Feldman & Bress [GF&B] agreed to pay to the class the sum of $283,335. In consideration for such undertaking, the class agreed to dismiss without prejudice all claims it has against GF&B.

(9) *Settlement # 9—The Class-Frison-Myer Feldman Agreement.* By the terms of this settlement, Feldman agreed to pay to the class and Frison the sum of $26,665, together with all of his limited partnership interests in IARF and RRE, having a value of $639.50; the class and Frison agreed to dismiss their claims against Feldman. By Addendum to the above agreement, Feldman agreed to assign to the class all claims he might have under the directors and officers insurance policies issued by American Employers' Insurance Company; and the class agreed to pay to Feldman out of the proceeds of any recovery on those insurance policies a pro rata share of the total proceeds received by *Bottger, et al.* up to a maximum of $24,000. Of the proceeds of $26,665 from this settlement, $10,000 or 37½% thereof is to be paid to Trustee Frison.

(10) *Settlement # 10—The Class-Peterson, Ross, Rall, Barber & Seidel and Herbert C. Loth, Jr. Agreement.* By the terms of this agreement, Continental Casualty Company CNA the insurer of Peterson-Ross and Herbert C. Loth, Jr., agreed to pay on behalf of Peterson-Ross the sum of $575,000 to the class. Additionally, CNA agreed to pay and did pay within 15 days of preliminary Court approval of the settlement, $50,-000 (of the $575,000) to defray costs of notice and publication to the class. CNA also agreed to share with the class the expenses of pursuing the American Employers' litigation. In consideration of such undertaking, the class agreed to dismiss without prejudice all claims it might have against Peterson-Ross or Herbert C. Loth, Jr. Trustee Frison entered into a separate agreement with Peterson-Ross and Herbert C. Loth, Jr. whereby he received $75,000 from CNA.

(11) *Settlement # 11—The Class-Arthur Andersen & Co. Agreement.* By the terms of this agreement, Andersen agreed to pay to the class the sum of $25,000, give to the class a Covenant Not To Sue with respect to any claim it has or may have against the class arising out of the *Bottger* litigation, and to dismiss various *Bottger*-related ap-

peals. In consideration of such undertaking, the class agreed to dismiss all claims it might have against Andersen and to hold Andersen harmless from any and all claims which might be asserted against Andersen by persons who are permitted after January 1, 1976, to opt out of the *Bottger* class. In addition, Frison agreed to give Andersen a Covenant Not To Sue with regard to claims arising out of the *Bottger* litigation. With regard to Frison, Andersen agreed to drop certain appeals affecting the IARF estate; however, no funds were received by Frison from Andersen.

(12) *Settlement # 12—The Class-Frison-Arthur Young & Co. Agreement.* By the terms of such agreement, Arthur Young agreed to pay Frison and the class the sum of $700,000. In consideration of such undertaking, Frison and class agreed to dismiss with prejudice all claims they might have against Arthur Young.

In addition to approval by this Court, all the above-described settlements in which Trustee Frison was a party were subject to approval, and have been approved in Civil Action No. 72–B–556, Reorganization Court, United States Court for the District of Colorado.

## LEGAL PRINCIPLES

Defendants now settling with the class and to whom this Order finally approving settlements is directed, are as follows: Charles F. McCoy; David E. Melendy; George C. Hardin, Jr.; Myer Feldman; Herbert C. Loth, Jr.; Peterson, Ross, Rall, Barber & Seidel; Arthur Young & Co.; and Arthur Andersen & Co.

At the hearing for final approval held June 14, 1976, the following parties were represented by counsel:

Class Plaintiffs
Trustee Frison
Myer Feldman
Charles F. McCoy
David E. Melendy
George C. Hardin, Jr.
Herbert C. Loth, Jr.
Peterson, Ross, Rall, Barber & Seidel

Ginsburg, Feldman & Bress
Arthur Andersen & Co.
Arthur Young & Co.

At such hearing the following witnesses testified:

Boniface DeBlasio, a class member
Frederic Courtenay, a class member
Nathan Vlock, a class member
Jack Nadrick, a class member
Phillip Hack, a class member
Theodore H. Frison, Trustee of IARF
Raymond Pfaff, an oil and gas consultant
Robert Olmstead, Vice President of RRC and RRE

The Court also received affidavits of class members Samuel Gordon, William C. Sherr, Harold A. Bottger and Robert M. Esposito.

The Court also heard the statements of class counsel, Mr. Bader, relating to the terms and conditions of the various settlements, and gave all counsel present the opportunity to speak in favor of or in opposition to such settlements. No opposition whatsoever was heard with regard to the settlements. Not one objection to the form or content of the Notice was received or brought to the attention of the Court. Approval of the terms and conditions of the proposed settlements and the form of notice by members of the class was unanimous.

In addition to considering the statements, testimony and evidence presented at the June 14, 1976, hearing, the Court read and considered all previous filings made with the Court relating to such settlements as well as the statements and evidence presented at the hearings on preliminary approval previously described.

Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure provide that an action brought under these rules "shall not be dismissed or compromised without the approval of the court." Under those rules, the authority to approve a settlement of a class or derivative action is committed to the sound discretion of the trial court. *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd* 440 F.2d 1079 (2nd Cir. 1971), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d

115 (1971); *3B Moore's Federal Practice,* § 23.80(4) (2d ed. 1975).

█ Within judicial discretion, the well-settled rule is that a settlement should be approved if it is fair, reasonable and adequate. ·*State of West Virginia v. Chas. Pfizer & Co., supra,* at 314 F.Supp. 740; *Neuman v. Electronic Specialty Co.,* CCH Fed.Sec.L.Rep. 92,955 (1970–71 Transfer Binder) (N.D.Ill.1971). *See Oppenlander v. Standard Oil,* D.C., 64 F.R.D. 597, 623.

█ In assessing the fairness, reasonableness, and adequacy of a proposed settlement, the Court should "compare the terms of the compromise with the likely rewards of litigation." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), *reh'g. denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425. This comparison requires consideration of two main elements. First, although the Court need not, and should not, decide the merits of the controversy, it should consider the existence of serious questions of law and fact which place the ultimate outcome of the litigation in doubt. See *Florida Trailer and Equipment Company v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960).

Second, the Court should consider the vagaries of litigation ʾand compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "It has been held proper 'to take the bird in the hand instead of a prospective flock in the bush'." *State of West Virginia v. Chas. Pfizer & Co., supra,* 314 F.Supp. at 743. *Accord, e. g., Protective Committee v. Anderson, supra,* 390 U.S. at 424, 88 S.Ct. 1157; *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 322 F.Supp. 834, 838 (E.D.Pa.1971), *modified and aff'd,* 453 F.2d 30 (3rd Cir. 1971).

█ In applying the above tests to a proposed settlement, the Court should also consider the judgment of counsel and the presence of good faith bargaining between contending parties. *See, e. g., Neuman v. Electronic Specialty Co., supra,* at 90,516. Courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or over-reaching:

"The Court will *not* substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.' "

(*Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y.1971) (emphasis in original). *Accord, Schleiff v. Chesapeake and Ohio Railway Company,* 43 F.R.D. 175, 178 (S.D.N.Y.1967).

In light of the foregoing, the Court, in assessing the fairness, reasonableness and adequacy of the settlements, has compared the results achieved by these settlements with the plaintiffs' chances of success in litigating the substantial, complex, and sharply contested legal and factual issues involved in this case. These issues, as derived by the Court from the previous pleadings, including the proposed Pre-Trial Order submitted on or about October 3, 1975, included but were not limited to the following:

(a) Whether the class, as designated by previous Orders of this Court, could have remained a class, or whether it was subject to division into sub-classes.

(b) Whether misrepresentations and/or omissions occurred in prospectuses and registration statements utilized by defendants in the sales of limited partnership interests in RRE and IARF.

(c) Whether such misrepresentations and/or omissions, if any, were material.

(d) Whether plaintiffs have withdrawn their common law claims in this proceeding.

(e) Whether, if plaintiffs have withdrawn such common law claims, any derivative claims remain.

(f) Whether plaintiffs' claims were barred by statutes of limitations, laches, waiver, or estoppel.

(g) Whether settling defendants engaged in fraud in connection with the sales of

IARF or RRE limited partnerships or whether such defendants aided and abetted such fraud.

(h) Whether plaintiffs could have shown reliance on any misrepresentations and/or omissions.

(i) Whether plaintiffs could have shown damages.

(j) Whether plaintiffs were limited to pursuing their claims under §§ 11 and 12 of the 1933 Securities Act or whether plaintiffs, in addition, had claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 promulgated thereunder.

(*l*) Whether plaintiffs could have shown the requisite scienter to establish a cause of action under Rule 10(b)–5.

(m) Whether there should have been a separate trial for certain settling defendants based on alleged differences in status of these defendants and other defendants.

(n) Whether certain individual settling defendants who functioned as outside directors had reasonable ground to believe and did believe, at the time each pertinent registration statement or amendment thereof became effective, that the statements therein were true and that there was no omission to state any material fact required to be stated therein, or necessary to make the statements therein not misleading.

(*o*) Whether certain individual settling defendants who functioned as outside directors solicited sales of partnership interests; whether settling defendants, or any of them, breached any fiduciary duties owed to limited partnership investors in IARF and RRE.

(p) Whether the NOPI is a property interest or management fee.

(q) Whether recent U.S. Supreme Court cases on the subject of various aspects of securities fraud, i. e., *Blue Chips Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), would have had an adverse impact on plaintiffs' case.

■ Together with the uncertainty involved in this litigation, as in all litigation, regarding the plaintiffs' chances for success, the Court has considered and been impressed with the many statements made and filed in support of all of the settlements by plaintiffs' counsel, plaintiffs' witnesses, settling defendants' counsel, and settling defendants' witnesses, and Trustee Frison. The Court was particularly impressed at the strong measure of support given the settlements by the class members appearing at the final hearing. These class members represented a substantial percentage of ownership in the IARF and RRE partnerships and spoke on behalf of an even larger percentage of ownership. The Court is of the opinion that the expression of such class members should be awarded the highest possible regard, since such individuals, because of their direct personal financial involvement, are perhaps the most directly affected by the outcome of this litigation of any of the parties.

As was stated previously, no objections of any kind were received by the Court, plaintiffs' counsel or coordinating counsel for the defendants, Jeffrey Hyman, Esq., opposing any of the settlements or the Notice to the Class.

■ The Court thus finds that each of the instant eight settlements is fair, reasonable, equitable, bona fide and adequate.

(a) The Court finds that each settlement was arrived at through arms-length and extensive negotiations between counsel for the plaintiffs and counsel for settling defendants and that such counsel engaged in no collusion whatever in arriving at such settlements. The Court notes the high competence and skill of counsel for the class and settling defendants, and is of the opinion that such settlements would not have been approved by counsel for all settling parties if such were not in the best interest of their clients.

(b) The Court finds that each settlement was arrived at in good faith and was based on a realistic appraisal by the parties and their counsel of the difficulties of proof

inherent in a case of this magnitude and complexity.

(c) The Court will not substitute its business judgment for that of the parties. However, the settlements taken as a whole are extremely fair and in the best interest of both the class and settling defendants. In fact, the Court is of the opinion that *not* to approve these settlements would be disadvantageous and would do a disservice to the class.

(d) The Court finds significant the fact that no class member or defendant or any other person challenged the settlements themselves, or any terms and conditions of any of the settlements, or raised any questions relating to the adequacy of the Notice to the Class. Quite the contrary, the class members above listed who did appear at the June 14, 1976, hearing enthusiastically supported all such settlements. There were no dissidents.

(e) The Court feels that there will be a savings of judicial time and resources as a result of these settlements. While the class retains its cause of action against defendants John M. King, Frank Eliot Sweetser, Marvin R. Barnett and Edward R. Annis, such proceeding is made immensely less complicated by these settlements.

(f) The Court recognizes that had these settlements not been reached, chances of the class prevailing against settling defendants would have been uncertain and disbursement of funds to the class, should it have prevailed, would undoubtedly have been delayed for some, perhaps lengthy, period of time given the high probability of an appeal or appeals in this case.

For the foregoing reasons and in accordance with this Court's bench ruling of June 14, 1976, incorporated herein by reference, and Final Judgment entered June 14, 1976, the Court finds these eight settlements, and each of them, to be bona fide, fair, just, reasonable and adequate compromises between the competing interest of the class on the one hand and the settling defendants on the other.

## APPLICATION BY COUNSEL FOR PLAINTIFFS FOR ALLOWANCE OF ATTORNEYS' FEES AND OUT-OF-POCKET EXPENSES; NOTICE TO INTEREST HOLDERS

Counsel for the plaintiff class have filed interim applications for allowance of attorneys' fees and reimbursement of out-of-pocket expenses (see Court filings of December 29, 1975, and January 22, 1976) and on April 6, 1976, a Final Application therefor.

The applications request attorneys' fees in an amount equal to twenty percent (20%) of the total recoveries to the limited partner investors and full reimbursement of out-of-pocket expenses. Class counsel have stated they will accept all or any portion of any fees to be awarded as a result of Settlement # 1 in cash or stock in a reorganized IARF.

The percentage amount of attorneys' fees and the expenses requested by plaintiffs' counsel were included in both publicized notices to class members regarding settlements as ordered by the Court. Pursuant to this Court's October 23, 1975, Order the Important Notice of Proposed Partial Settlements, published in *The Wall Street Journal* (National edition), *The Denver Post* and *The Rocky Mountain News* on November 6, 1975, and mailed by plaintiffs' counsel to all class members, advised them of the Court's intention to hear counsels' application for fees and costs at the completion of the hearing on January 23, 1976, and the amounts thereof. Members of the class were informed of their rights to file objections to any such application or amount and to appear at any hearing thereon.

Likewise, pursuant to this Court's Order of March 31, 1976, authorizing mailing and publication of the Important Notice of Proposed Partial Settlements of Class Action in *The Wall Street Journal* (National edition), *The Denver Post* and *The Rocky Mountain News* on April 22, 1976, such Notice advised the class that the Court would consider an award of attorneys fees and costs on June 14, 1976, and that any member could object to such an award or to the amount thereof.

We expressly find that adequate notice and an opportunity to be heard has been afforded all interested parties.

Though all class members were fully advised by said Notices of the amounts of the requested allowance for the legal services and disbursements and of the right of any class member to object and be heard at the hearings with respect thereto, the Court notes that not one objection was voiced by any class member to the requested allowances. At the hearing on January 23, 1976, one investor/class member Thomas W. Itin, who had filed a written objection to the fee application as it related to one limited partnership, Royal 1968–4, withdrew his objection and stated in open Court his support for the proposed award. Furthermore, one of the plaintiffs' counsel, Eugene W. Landy, submitted an affidavit stating he had conferred with personal counsel for several named plaintiffs, all of whom support the proposed award of fees and costs.

### CRITERIA IN DETERMINING AMOUNTS OF REASONABLE ATTORNEY FEES

Rule 23, Federal Rules of Civil Procedure, is silent as to the Court's authority to fix attorneys' fees. Rule 23(e) merely provides for the approval by the Court of the compromise or settlement of a class action.

■ The authority and discretion for fixing attorneys' fees in connection with the approval of settlements arises, therefore, from the so-called equitable fund doctrine. See Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1938) and Mills v. Electric Autolite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

Where plaintiffs and their counsel have successfully maintained a suit on behalf of a class which results in a settlement fund to be divided among all the members of the class, it has been recognized that to allow the class to obtain full benefit from plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense. Consequently, the named claimants, as the representatives of the class, are authorized to contract for and to incur all proper expenses of the litigation. It has been likewise recognized that the settlement fund realized through efforts of such plaintiffs and their counsel should bear the burden of the allowances for attorneys' services.

There is no fixed standard or guide by which we can determine reasonable attorneys' fees. The entire litigation must be considered and evaluated to arrive at a just allowance fair to all parties.

In addressing ourselves to a reasonable and fair award of attorneys' fees in complex litigation, we are not embarking into a strange and unknown field.

Unlike determining the value of services rendered in other specialties and professions, the value of legal services is within the Court's own knowledge. As an attorney, the Court brings its own experience to the question of a fair evaluation of services rendered against the total backdrop of the circumstances of a particular litigation.

■ With these thoughts in mind, we have considered the following criteria in the allowance and award of attorney fees:[2]

Benefits Conferred Upon the Members of the Class—Results Achieved;

2. In developing these criteria we have considered—in addition to other authorities cited herein—our previous opinion in Richard C. Oppenlander et al. v. Standard Oil Company (Indiana) et al., 64 F.R.D. 597 (D.Colo.1974); Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) (employment discrimination case); Pomerantz, "Class Action Controversy: Legal Fees," in Current Problems in Federal Civil Practice 367 (B. Garfinkle ed. 1975); W. Knepper, Liability of Corporate Officers and Directors, 13.13, "Class Actions: Attorneys' Fees and Expenses" (2d ed. 1969, 1973); Comment, "Attorneys—New Standard, Reflecting the Nature of the Action, Applied to Determine a Reasonable Fee Award for Class Action Attorneys," 8 Suffolk U. L. Rev. 1354 (1974); Comment, "Balancing the Equities in Attorney's Fees Awards: Losing Plaintiffs and Private Defendants," 62 Geo. L. J. 1439 (1974); Comment, "Computing Attorney's Fees in Class Actions: Recent Judicial Guidelines," 16 Bost. Coll. Ind. & Com. L. Rev. 630 (1975); Comment, "Reimbursement for Attorneys' Fees from the Beneficiaries of Representative Litigation," 58 Minn. L. Rev. 933 (1974).

Time and Effort Expended by Counsel in the Litigation;

Advance Fee Arrangements, If Any, Between Counsel and Members of the Class;

Point in Time During the Litigation When Settlement Was Achieved—Proximity to Trial;

Magnitude, Complexity and Novelty of the Litigation—Legal Questions Presented and the State of the Law;

Assistance, If Any, From Governmental Agency or Other Related Proceedings;

Court's Knowledge of the Nature, Extent and Quality of Services Rendered by Counsel;

Considerations of Public Policy;

Responsibility Undertaken by Class Counsel—Risks Involved and Inherent Preclusion of Other Employment;

Awards in Similar Cases;

Nature and Extent of Objections, If Any, to Allowance of Attorney Fees

*Benefits Conferred Upon the Members of the Class—Results Achieved*

Based upon the testimony of Trustee Frison, Raymond E. Pfaff, Robert Olmstead and others, and on the numerous exhibits adduced at the hearings held on September 18 and 19, 1975; December 19, 1975; January 23, 1976; February 26, 1976; March 1, 1976; and June 14, 1976, and this Court's close association with this litigation, we are fully conversant with the terms and conditions of the partial settlements and the value and benefit thereof to the members of the class.[3] We find that the recovery effected for the class by virtue of these settlements and the efforts of counsel for Plaintiffs is not less than the following:

| Settlement No. | Total Value of Settlement to Class | Benefits to IARF Investors Based on Present Worth | Benefits to RRE Investors Based on Present Worth |
|---|---|---|---|
| 1 | [4] $ 9,500,000 | $ 9,500,000 | $------- |
| 2 | [5] 2,060,000 | ------ | 2,060,000 |
| 3 | 63,086 | 33,320 | 29,766 |
| 4 | ------ | ------ | ------ |
| 5 | 20,183 | 15,138 | 5,045 |
| 6 | 3,181 | 2,386 | 795 |
| 7 | 34,918 | 26,188 | 8,730 |
| 8 | 283,333 | 212,500 | 70,833 |
| 9 | 17,305 | 12,979 | 4,326 |
| 10 | 575,000 | 431,250 | 143,750 |
| 11 | 25,000 | 18,750 | 6,250 |
| 12 | 700,000 | 525,000 | 175,000 |
| | $13,282,006 | $10,777,511 | $2,504,495 |

3. It should be noted that based upon testimony and evidence presented by class counsel at the June 14, 1975, hearing, various factors, including changes in interest rates and the price of oil have dramatically increased the value of the settlements to the class, particularly Settlements # 1 and # 2. The Court takes cognizance of such evidence as the most recent and accurate evidence as to the value of such settlements.

4. Trustee Frison testified at the hearing that the cash on hand in the IARF Estate was an estimated $11,500,000, and that net cash flow was approximately $300,000 per month. The Court notes, however, that Frison's Report and Summary # 50 shows cash on hand at the end of May, 1976, was $12,030,278, which amount, plus estimated net cash inflow of $300,000 for the month of June, would place cash on hand, as of June 15, 1976, of $12,180,000, and, as of

June 30, 1976, of $12,330,000. A summary of the testimony on June 14, 1976, as to the value of the IARF Estate is as follows:

| | |
|---|---|
| Cash on Hand | $12,180,000 |
| Other assets (equipment, miscellaneous property) | $ 4,140,000 to $2,740,000 |
| Oil and gas properties (at present worth) | $62,000,000 $78,320,000 to $76,920,000 |
| Less FEA and Beta lease packages | $ 7,700,000 to 3,700,000 $76,000,000 |

12½% of $76,000,000 = $9,500,000

5. Includes proceeds from NOPI generated by RRE 1968–4, estimated to be $206,000. Attorneys' fees therefrom are separately considered in Order 1976–38.

The recovery to the class members, estimated at approximately $13,000,000, is a significant sum, under any circumstances. Several of the defendants, including some of the settling defendants, are in reorganization or in bankruptcy, and have claims against them in the hundreds of millions of dollars. The instant settlements, representing as they do, an 80% to 90% recovery of the funds available from such defendants, without the risks of collectability or litigation, are a significant benefit to the class.

Plaintiffs' counsel have also conferred a benefit on the class by including a provision in settlement # 1 and the Conditional Allocation Agreement entered into between class counsel and Frison (and approved by this Court) allocating not a fixed amount, but 12½% of the value of the estate of IARF to the class. This provision is a valuable benefit to the class members affected thereby, because the price of oil and natural gas has risen sharply and may rise even further. Had this provision not been included, taking into consideration the increase in price of oil and natural gas, the recovery for the class would have been reduced significantly.

■ While other factors are of substantial importance in determining reasonable attorney fees, the amount of the recovery, and end result achieved are of primary importance, for these are the true benefit to the client. *See generally* Hornstein, "Legal Therapeutics: The 'Salvage' Factor in Counsel Fee Awards", 69 *Har.L.Rev.* 658, 682 (1956).

In awarding attorney fees in class actions the courts have cited "the value of the settlement," *Derdiarian v. Futterman Corp.*, 254 F.Supp. 617, 620 (S.D.N.Y.1966); "the amount recovered," *Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478, 480 (S.D.N.Y.1970) and *Perlman v. Feldmann*, 160 F.Supp. 310, 311 (D.Conn.1958); "the results achieved" for the class, *Philadelphia*

*Elec. Co. v. Anaconda Amer. Brass Co.*, 47 F.R.D. 557, 559 (E.D.Pa.1969); "[t]he result of the case, because that determines the real benefit to the client," *Rogers v. Hill*, 34 F.Supp. 358, 363 (S.D.N.Y.1940).

> "[T]he fee should be measured in relation to the benefits conferred upon the members of the class. There is no better test than this of the efficacy of the services rendered."

*Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221, 224 (N.D.Ill.1974); *see also Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3rd Cir. 1975).

The institution of the suit, highly professional case preparation by plaintiffs' counsel, counsel's experience in complex litigation, and posture in settlement conferences were of crucial importance in bringing this litigation to a successful though partial financial recovery for the class. The recovery can be attributed to efforts of counsel to effectuate a satisfactory recovery.

Recovery in any amount was problematical in this difficult litigation. We conclude that the result attained was not possible without litigation. We also note that the recovery was realized without trial and, further, that the considerable expenses of prolonged litigation and certain appeals were saved. The recovery inuring to the benefit of the class pursuant to the Court-approved settlements is one of the larger recoveries realized by trial or by settlement of litigation under the securities laws of the United States. This outstanding recovery alone makes this case and the legal services rendered to the class unique and extremely successful.

Many courts, in analyzing applications for attorney fees, however, are increasingly emphasizing factors other than the results obtained. *Lindy Bros. Bldrs. v. American R & S Stand. Corp.*, 487 F.2d 161 (3rd Cir. 1973); [6] *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

---

6. We have considered the opinion of the Third Circuit on the subsequent appeal of the fee

award in *Lindy Bros. Bldrs. v. American R & S Stand. Corp.*, 540 F.2d 102 (3rd Cir., filed July

*Time and Effort Expended by Counsel in the Litigation*

One of the factors relevant to the award is the time necessarily spent on the case by counsel. *See Grunin v. International House of Pancakes*, 513 F.2d 114, 128 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *City of Detroit, supra*, at 470; *Cherner v. Transitron Electronic Corp.*, 221 F.Supp. 55, 61 (D.Mass. 1963).

We have received and considered all affidavits, as supplemented, of plaintiffs' counsel, Bader & Dufty and Landy & Spector, as well as the actual time cards kept by Bader & Dufty. (Exhibits 16, 42 and 43, Hearing, June 14, 1976, as supplemented). *See Liebman v. J. W. Petersen Coal & Oil Co.*, 63 F.R.D. 684, 695 (N.D.Ill.1974). Those affidavits and time cards show the time spent in this action by each of the attorneys for plaintiffs, the firms' normal hourly rates and other factors normally considered by those firms in determining fees. The affidavits show that to July 30, 1976, for Bader & Dufty, and to July 30, 1976, for Landy & Spector, the following recorded hours, by categories of partner or associate, respectively, have been spent by plaintiffs' counsel in this case:

Partners 7,896
Associates 3,290
TOTAL 11,186

Of the time spent by Bader & Dufty partners in this litigation Mr. Bader spent 3,421.8 hours, Mr. Dufty spent 350 hours, and Mr. Stutz spent 2.33 hours.[7] Associates employed by Bader & Dufty, Messrs. Robert J. Dyer, III, R. Gregory Stutz and others spent 3,290.1 hours. Mr. Landy, of Landy & Spector, a partner, spent 4,122 hours on this litigation.

Thus, through July 30, 1976, plaintiffs' counsel have expended in excess of 11,000 hours of lawyers' time in the action, over two-thirds (⅔) of these hours having been expended by partners, and the remainder by associates.

In view of the complexity and magnitude of this litigation and the magnitude of the recovery, the total time already devoted and to be devoted to this action in the future by plaintiffs' counsel is entirely reasonable, necessary, has benefitted and will benefit the class.

An hourly rate would not be a very realistic yardstick to determine attorneys' fees in complex litigation where an extremely large recovery is achieved with attendant risks and circumstances found in this litigation.

As noted by Professor Hornstein:

Where success is a condition precedent to compensation, "hours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a patient would think he is entitled to more.

*Legal Therapeutics, supra*, at 660. *See also Electronics Capital Corp. v. Sheperd*, 439 F.2d 692 (5th Cir. 1971). In light of all relevant factors discussed herein below, the Court finds that the allowance requested by plaintiffs' counsel is reasonable.

*Advance Fee Arrangements, If Any, Between Counsel and Members of the Class*

An affidavit and supplemental affidavit relating to fee arrangements with clients in various types of litigation have been filed by Gerald L. Bader, Jr. These affidavits specify the hourly rates on non-contingent legal matters charged by them personally and members of the respective firms.

---

2, 1976). Nevertheless we have determined the instant fee application on its unique facts and have applied criteria which we find most realistic and equitable.

7. Mr. Stutz became a partner in the firm effective January 2, 1976; his time prior to that date is recorded as associates time.

Representation by plaintiffs' counsel in this litigation was purely on a contingent basis.[8]

Mr. Bader's Supplementary Affidavit (filed January 22, 1976) states in part:

"That affiant and his firm have always viewed this proceeding as a contingency fee case; neither affiant nor his firm ever would have undertaken representation of Plaintiffs and the class on a purely contingent basis if there had ever been any thought that the hourly rates of affiant and his firm would be used as the basis for the fees to be awarded by the Court, especially where, as here, fees would not be received until five or more years later, if at all."

All affidavits emphasize that representation by counsel would have never been undertaken if remuneration would be based on hourly rates of pay.

*Point in Time During Litigation When Settlement Was Achieved—Proximity to Trial*

It should also be noted that most of the partial settlements did not occur until the very eve of trial; in fact one of the above-described settlements was not recorded until some four days after trial was set to commence. *See Gissen v. Colorado Interstate Corp.*, CCH Fed.Sec.L.Rep. 95,012 (D.Del.1975). The final partial settlements were arrived at during the same days that the Court and counsel were considering preliminary matters to selection of the jury. In our view this factor is pertinent here because all pretrial procedures and preparation had been completed at the time settlement was achieved.

*Magnitude, Complexity and Novelty of the Litigation—Legal Questions Presented and the State of the Law*

Many unique and complex issues were presented in this litigation. The class action questions presented were without precedent in this District, especially with respect to such matters as whether there were conflicts within the class, whether sub-classes should be established, whether there were defenses personal to some members of the class, whether transferors of limited partnership interests were properly included within the class, and whether defendants should be permitted to engage in discovery of class members (and if so, the nature and extent thereof).

The litigation also involved unique and substantial issues of law in the technical area of SEC Rule 10b–5, Section 10(b) of the Securities Exchange Act of 1934, the scope of attorney-client privilege in connection with a corporation with interlocking directors and in derivative suits, the tax consequences of any judgment or settlement, difficult, complex and oft-disputed class action questions, and difficult questions regarding computation of damages. The novelty and difficulty of the issues presented as well as the lack of supporting authorities at the time of commencement of the action are relevant to our consideration of an allowance of attorneys' fees. *See Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, 436 F.2d 699, 701 (1st Cir. 1970).

The settlement agreements, themselves, highly complex and involving parties in bankruptcy, in reorganization and otherwise, and the obtaining of necessary approvals of four different courts, all without prejudicing plaintiffs' claims against non-settling defendants, are an indication of the diligence, thoroughness and ability of class counsel. Serious problems were considered and met, such as possible release of joint tort-feasors, assignment of directors and officers insurance claims, indemnification for contribution under the Securities Act and the like.

In depth discovery was required, and was undertaken by plaintiffs. More than fifty (50) depositions were taken, including all defendants and many witnesses, extensive interrogatories were asked and answered, and requests to produce resulting in examination of over 300,000 documents were filed.

---

8. The contingent nature of counsel's compensation has long been recognized as justifying a larger fee. *Illinois v. Harper & Row Pub. Inc.*, 55 F.R.D. 221, 224 (N.D.Ill.1972).

Discovery was probably more extensive and detailed than in any recent case in this district. Thus problems in connection with discovery, including difficult areas of attorney-client privilege, and the applicability of the work product doctrine to documentary discovery in this case likewise presented many novel issues.

In support of their joint application for allowance of fees, plaintiffs called Patrick M. Westfeldt, Esquire, of Denver, John Edward Moye, Esquire, of Denver, and Richard M. Phillips of Washington, D.C. to testify as experts at the hearing on January 23, 1976. In addition, Phillip G. Dufford, Esquire, Robert D. Inman, Esquire, and Ernest W. Lohf, Esquire, counsel for certain of the settling defendants testified, not as experts, but as officers of the Court. Likewise, John A. Criswell, Esquire, special counsel to Trustee Frison, testified at the hearing on June 14. Biographical resumes of the expert witnesses were received by the Court as exhibits at the hearing held on January 23, 1976.

The testimony of the expert witnesses was in accord with the observations of this Court that the instant litigation was extensive, hard-fought, novel and complex, and was marked throughout by high risk. The witnesses accorded significant praise to the diligence and competence with which all counsel had conducted the litigation. The witnesses, without exception, endorsed the application for an award of costs and attorney fees as justified and reasonable in the amount requested.

Mr. Richard M. Phillips, a member of the law firm of Hill, Christopher, and Phillips, P.C., Washington, D.C., formerly a member of the staff of the Securities and Exchange Commission, presently representing the plaintiffs in the *National Student Marketing* case, the author of numerous publications in the securities area; and past participant on several panels and other educational forums in the securities area, was qualified as an expert witness.

Mr. Phillips stated that a law firm taking on litigation of this size is confronted with numerous problems. Counsel must as-certain from documents, largely in the hands of defendants, whether an incomplete statement or half-truth or simply a misleading statement can be proven to be such, as a result of the efforts of counsel. A lawyer in undertaking such litigation must recognize that he is making a decision that will affect his career for the rest of his life and certainly change his professional, business and personal life for, at least, the next five or six years; this is particularly true when professionals, such as national accounting firms and national law firms, are involved since these kinds of defendants receive the best representation. He stated that he was personally familiar with many of the defense counsel and felt that they represented the finest of the defense bar in the United States.

Mr. Phillips also testified, briefly, as to the "corporate therapeutic" effect of such litigation, the great risk of taking such litigation on a contingency fee basis, the social need for adequate fees being awarded, and the fact that, in his opinion, the services of plaintiffs' counsel in this case were highly competent and diligent. He also testified that a payment of attorneys' fees of twenty percent (20%) of the recoveries received for the class would be reasonable and adequate in this litigation.

Thomas W. Itin, an investor in RRE 1968–3 and 1968–4 (and other partnerships) testified on January 23, 1976, that, after listening to the testimony, he was convinced the application was reasonable; the genesis of his letter opposing the fees was based upon his concern that RRE 1968–4 should not have to pay counsel anything. However, in light of what he had heard at the fee application hearing, he asked the Court to approve the application for fees; he suggested that the percentage should be up to the Court.

One member of the plaintiff class, Boniface DeBlasio, testified at both hearings in favor of the application for attorneys' fees in the amount of twenty (20%) percent of the recovery. Mr. DeBlasio stated that he had extensive experience in employing attorneys, both in the United States and

abroad, that he was presently the Chairman of the Board of Renault Winery, and he felt that the fees sought by counsel, in the light of the services performed and results achieved, were, in his opinion, very modest.

Other named plaintiffs and/or members of the class testified at the hearing on June 14, 1976, including: Frederic Courtenay, Nathan Vlock, Jack Nadrick, and Phillip Hack. These class members testified before the Court and expressed support for the amount of attorney fees sought in this application. The Court has also received and considered affidavits of additional class members.

In considering the complexities of this litigation we have taken into account the fact that plaintiffs were limited partners and did not have derivative power of discovery of defendants' documents without order of Court. In addition, several of the key defendants were defunct and out of operation, thus forcing plaintiffs to reconstruct records of activities over a period of years with many of the records destroyed or otherwise missing and with key employees and others scattered to the "four winds" and not subject to process. Discovery problems were compounded by extensive stays sought and obtained by Frison, thus delaying discovery for years. Other defendants, such as The Colorado Corporation, John M. King and King Resources Company, were in bankruptcy where Stay Orders were entered, thus precluding plaintiffs from the normal avenues of discovery available in ordinary litigation. The discovery issue was sharply litigated.

In our *in camera* examination of claimed privileged documents (of various defendants) it was clearly evident that the factual and legal questions inherent in the litigation were substantial. The task of plaintiffs' case preparation could be classified as monumental.

Discovery was not conducted against mediocre adversaries. We have some fifty (50) plaintiffs doing battle against several of the country's finest law firms—the battle carried on by non-settling defendants made plaintiffs' ability to demonstrate the strength of their case against others (such as against settling defendants) very difficult; all defendants were receiving the benefit of the work of other highly competent counsel representing national accounting firms and national law firms. At one time it was stated in Court that over eighty (80) lawyers (plus assorted paralegals) were working on the case for defendants.

Demonstrative of the complex, unique character of this litigation and the exhaustive, uninterrupted advocacy of counsel for plaintiffs and the class, as well as defendants, is the index of papers filed in Court. The entries on the court's docket, as of August 1, 1976, consist of 124 pages and represent in excess of 2000 separate pleadings in number, an astounding number—almost four (4) times the entries in the *Oppenlander* litigation previously considered by this Court. *Oppenlander, et al. v. Standard Oil Company (Indiana)*, 64 F.R.D. 597 (D.Colo.1974).

The Tenth Circuit Court of Appeals has noted:

> The defendants are a diverse group with quite different duties and responsibilities placed upon them by the federal acts. The defendants include the twenty-five or twenty-six limited partnerships, the corporate general partners, the officers and directors of the general partners, the parent management companies of the general partners, certain underwriters, attorneys, accountants for the partnerships and for related companies, and individuals. The directness of the transactional relationship between the plaintiffs and the defendants varies greatly. There are derivative claims asserted as well as direct claims. One of the general partners is undergoing reorganization.

*Royal Resources Corporation v. Bottger*, 525 F.2d 211, 212 (10th Cir. 1975).

Massive interrogatories were served and massive answers thereto were required. Moreover, motions and briefs were filed with respect to novel legal issues in the developing field of class actions, federal securities laws, attorney-client privilege and

work-product, conflicts of interest and other matters inherent in the litigation.

Depositions were taken in Houston, Denver, Tulsa, Washington, D.C., Chicago, and New York. ·A list of deponents appears in the court files; plaintiffs noticed and took in excess of fifty (50) depositions; defendants noticed and took about one-half (½) that number.

Plaintiffs' counsel crisscrossed the country at numerous times on discovery and trial matters. Discovery by deposition was intense and exhaustive. Depositions began within three (3) months from the time Stay Orders were lifted and continued for months. A reading of the various depositions taken by plaintiffs demonstrates that they were searching, hard fought and difficult, and plaintiffs' counsel, on nearly all occasions, were confronted by objections of more than fifteen (15) attorneys at one time. The schedule was exhausting, compounded by the Orders of this Court terminating discovery in anticipation of a trial date in March, 1975, thus forcing plaintiffs who had to rely entirely on documents and testimony produced by defendants, to compress discovery into three (3) months or less. One of the counsel for plaintiffs was literally taking depositions for six (6) days a week for a period in excess of two (2) months.

This litigation also had a technical side apart from the numerous legal questions outlined above. In addition to the extensive review of documents, oral depositions and written discovery efforts, plaintiffs have represented to the Court that they consulted with independent experts in order to prepare for trial and to evaluate the documents and the testimony being elicited in connection with discovery. The obtaining and preparation of experts in the field of professional liability is well known to· be particularly difficult. It is readily apparent that the information developed by plaintiffs' counsel in the course of discovery was of a technical or financial nature.

It has been represented by plaintiffs that in order to understand the accounting principles involved, plaintiffs' counsel conferred with Daniel J. Cronin and Morton B. Solomon of Main LaFrentz & Company in Denver and New York City, and Thomas Bickel in New Jersey. Plaintiffs also conferred with experts in the area of securities fraud, among them Richard Meyer of New York City. The search for and consultation with experts and other potential witnesses required plaintiffs' counsel to travel to New York, Houston and Tulsa.

A number of courts have mentioned the "novelty and difficulty" of the legal issues involved in the case as a factor to be considered in setting appropriate fees, *United States v. Local 3, IUOE, International Union of Operating Engineers*, 6 FED Cases 984, 986 (N.D.Cal.1973) and *Illinois v. Harper & Row Publishers, Inc., supra*, at 228; and at least one court considered this factor to be of major importance in fixing the attorneys' award. *Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478 (S.D.N.Y. 1970), *modified on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). *See also Kiser v. Miller*, 364 F.Supp. 1311 (D.D.C.1973); *Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561 (7th Cir. 1951).

### Assistance, If Any, From Governmental Agency or Other Related Proceedings

Neither plaintiffs' nor defendants' counsel had the benefit of a prior judgment or ruling in a similar or related case brought by the government or a private party. Thus, there was no prior litigation either in a government inspired or private lawsuit that terminated in a judgment favorable to the position of plaintiffs in the instant litigation. Indeed, there were statements that the pendency of criminal action against one of the principal defendants actually impeded the investigation of plaintiffs into the facts and circumstances giving rise to their claims against defendants.

### Court's Knowledge of the Nature, Extent and Quality of Services Rendered by Counsel

One of the factors which contributes to the trial court's evaluation of the value of the attorneys' services is the quality of the work which the judge has observed. *Lindy*

*Bros., supra, Accord, Freeman v. Ryan,* 133 U.S.App.D.C. 1, 408 F.2d 1204, 1206 (1968).

The Court has presided over all phases of this case since March, 1972, and is thoroughly familiar with the litigation and extent of the quality of services rendered by counsel for plaintiffs and defendants. The Court is familiar with the high quality and professional reputation of all defense counsel.

The case has been hard fought by counsel from the beginning to the end. Professional services of all principal attorneys in this litigation were of the highest order; all aspects of this case were handled with responsibility, thoroughness, and diligence. Counsel are commended for exceptional services rendered on behalf of their respective clients.

The Court has thorough and personal knowledge of the high professional standing and reputation of counsel.

We have personally observed and heard oral argument from all principal counsel for plaintiffs in various hearings before the Court.

## Considerations of Public Policy

■ In awarding attorney fees in a class action, the Court is charged with the duty of being fair to class members who are viable litigants, non-appearing class members, and the attorneys whose efforts and professional abilities have produced the recovery.

A proper balance must be struck which takes into account public policy considerations. The allowance must be sufficiently generous, in those cases in which a recovery is effected, to encourage competent counsel to accept representation in these private actions, which vindicate the Congressional purposes of the federal securities laws and the federal antitrust laws. The allowance of fees should have for a consideration sufficient incentive to competent counsel to remain in the field of public interest litigation. As one district court has recently stated, "To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding. The concept of a private attorney acting as a 'private attorney general' is vital to the continued enforcement and effectiveness of the Securities Acts." *Bleznak v. C. G. S. Scientific Corp.,* 387 F.Supp. 1184, 1189 (E.D.Pa.1974).

In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 396, 90 S.Ct. 616, 628, 24 L.Ed.2d 593 (1970), the Supreme Court made a comment particularly pertinent to the facts of the present case:

"[P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders . . . ."

In awarding counsel fees in successful actions, we recognize that unless competent attorneys are encouraged by adequate awards to undertake representation of this kind, the interests of minority stockholders would often be left without any protection. *Oppenlander, supra,* at 613–14. *See also Alpine Pharmacy, Inc., v. Chas. Pfizer & Co.,* 481 F.2d 1045, 1050 (2nd Cir. 1973).

If this were not a class suit, but had been brought solely for the named plaintiffs, the proposed settlement would have resulted in a modest recovery for named plaintiffs. The recovery perhaps would have been drastically reduced by out-of-pocket expenses. Had plaintiffs' counsel represented plaintiffs as individuals, pursuant to conventional non-contingent fee arrangements, such fees and the out-of-pocket expenses would have more than consumed any recovery. Recovery in any amount was highly problematical without the representation of competent dedicated counsel.

As a practical matter, this action could only have been brought as a class action. It would have been extremely burdensome for a few individuals to finance and carry on such litigation. Out-of-pocket expenses alone have to date exceeded $292,000.00.

## Responsibility Undertaken by Class Counsel—Risks Involved and Inherent Preclusion of Other Employment

In evaluating the services rendered in this case, appropriate consideration must be given to the risks assumed by plaintiffs'

counsel in undertaking the litigation. The prospects of success were by no means certain at the outset, and indeed, the chances of success were highly speculative and problematical. As mentioned before, plaintiffs' counsel did not have the assistance of prior (or contemporaneous) governmental proceedings and, in fact, evidence has been received supporting the assertion that government criminal proceedings and investigations against certain defendants actually hindered plaintiffs' counsel in their preparation. Accordingly, the entire burden of (a) developing the facts, (b) developing viable and probable theories for recovery and (c) the management and organization of a complex case with a myriad of documents and depositions was borne by plaintiffs' counsel.

We have accorded considerable weight to the size of the law firms of plaintiffs' counsel, their diligence and competency, and the ability and standing of the attorneys for plaintiffs in this hard-fought action.

We also have given consideration to the fact that the services performed in this case were performed under very great and continuing pressures of time by plaintiffs' counsel. Pressures of time and travel involved not only personal inconvenience, but made it difficult for the attorneys to maintain any normal client relationships with regular clients. Indeed, this case was a career case for several of plaintiffs' counsel and monopolized their professional time for over a period of months. Time limitations imposed by virtue of this litigation were tremendous.

■ As mentioned above, in class actions of this type which result in a recovery, the Court may properly take into account the fact that one purpose of the allowance is to encourage competent, experienced attorneys to be willing to undertake representation of a class in a civil action, brought to enforce the securities and antitrust laws of the United States. *See Smolowe v. Delendo Corp.,* 136 F.2d 231, 241 (2d Cir.) *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); *Dolgow v. Anderson,* 43 F.R.D. 472, 494 (E.D.N.Y.1968); *Rosenfeld v.*

*Black,* 56 F.R.D. 604 (S.D.N.Y.1972). *See also,* Hornstein, *The Counsel Fee in Stockholder's Derivative Suits,* 39 Colum. L. Rev. 784, 815 (1939).

*Awards in Similar Cases*

Our research reflects that fee allowances in class actions brought under the federal securities laws have traditionally been "within the generally accepted range of twenty percent (20%) to thirty percent (30%) of the benefit bestowed upon the class." *See, Schlusselberg v. Keystone Custodian Funds, Inc.,* CCH Fed. Sec. L. Rptr. 93,901 (S.D.N.Y.1973); *Oppenlander v. Standard Oil, supra; Rosenfeld v. Black, supra. See also, Bleznak v. C. G. S. Scientific Corp., supra,* at 1190 n. 1, where numerous recent cases are listed showing the general range of counsel fees awarded in securities laws cases, to be from 20 percent (20%) to 30 percent (30%). Fees in that general range have been allowed, even where very large recoveries have been effected, where warranted by the circumstances of the particular case and by the magnitude and quality of counsel's legal services. *See, e. g., Philadelphia Elec. Co. v. Anaconda Amer. Brass Co.,* 47 F.R.D. 557, 559 (E.D.Pa.1969); *Lehigh Valley R.R. v. Peaslee,* 47 F.Supp. 55 (E.D.Pa.1942); *Philadelphia v. American Oil Co.,* Civil Action No. 647–48 (D.N.J., June 23, 1973). The fees awarded in this litigation are in the lower range of awards in class actions involving substantial recoveries. The Court notes that this conclusion was supported by testimony from Richard Phillips, one of plaintiffs' experts at the hearing on attorneys' fees. While we reject any mechanical application of a fee percentage formula in such cases, our study of opinions of the Court of Appeals for the Tenth Circuit reveals that fees ranging from 15 percent to 50 percent of substantial recoveries have been affirmed. *Simler v. Conner,* 352 F.2d 138 (10th Cir. 1965), *cert. denied,* 383 U.S. 928, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); *Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97 (10th Cir. 1973); *Hanna Paint Mfg. Co. v. Rodey, Dickason,*

*Sloan, Akin & Robb,* 298 F.2d 371 (10th Cir. 1962); *United States v. Anglin & Stevenson,* 145 F.2d 622 (10th Cir. 1944), · *cert. denied,* 324 U.S. 844, 65 S.Ct. 678, 89 L.Ed. 1405 (1945), and *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961), *appeal dismissed,* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). See also *Wewoka v. Banker,* 117 F.2d 839 (10th Cir. 1941), approving an award of attorneys' fees out of funds successfully protected for the benefit of municipal district improvement bonds.

The provisions in the Code of Professional Responsibility relating to fee matters are DR 2–106 and EC 2–18. Other considerations for the assessment of attorneys' fees in class actions are set out in the *Manual for Complex Litigation* (Part 1, § 1.47). The following law review articles deal with awards of attorneys' fees in class actions: Hornstein, *Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, supra,* 69 Harv. L. Rev. at 660–661; Hornstein, *New Aspects of Stockholders' Derivative Suits,* 47 Colum. L. Rev. 1 (1947); Hornstein, *Problems of Procedure in Stockholder's Derivative Suits,* 42 Colum. L. Rev. 574 (1942); Hornstein, *The Counsel Fee in Stockholder's Derivative Suits, supra,* (Professor Hornstein's articles have been cited with approval by a great number of courts, including the United States Supreme Court in *Mills v. ELectric Auto-Lite Co., supra,* 396 U.S. at 394, 396, 90 S.Ct. 616). Dol, *The Settlement of Class Actions for Damages,* 71 Colum. L. Rev. 971 (1971); Haudek, *The Settlement and Dismissal of Stockholder's Actions,* 23 Sw. L. J. 765, 792–801 (1969); Kalven & Rosenfield, *The Contemporary Function of the Class Suit,* 8 U. Chi. L. Rev. 684 (1941); Nussbaum, *Attorney's Fees in Public Interest Litigation,* 48 N.Y.U.L.Rev. 301 (1973). *See also* Annot., *Attorneys' Fees in Class Actions,* 38 A.L.R.3d 1384 (1971).

*Nature and Extent of Objections, If Any, to Allowance of Attorney Fees*

As noted, no objection to the requested fee of twenty percent (20%) has been voiced in writing, by appearance or otherwise by any member of the class.

## COSTS

█ All class counsel have submitted affidavits in support of their application for reimbursement of costs reasonably incurred by plaintiffs; in addition, Bader & Dufty have filed their ledger sheets which were admitted without objection at the hearing held on June 14, 1976. Supplements thereto have been filed with the Court together with supplemental affidavits of counsel.

Based on these documents, as well as the findings made by this Court in its Order 1976–19 filed on March 24, 1976, which Order is specifically incorporated herein, the Court finds that except for $2,400.00 paid to Richard M. Phillips, Esquire, an expert witness who testified on the reasonableness of class counsel's attorneys' fee application, all costs expended by plaintiffs were and are fair and reasonable and necessarily incurred in connection with the litigation. Based on the latest information supplied to the Court, plaintiffs have expended, as of July 30, 1976, $292,163.61 in furtherance of this litigation, of which amount $289,763.61 is hereby approved and ordered to be paid to class counsel out of the proceeds from the various settlements. The source of such repayment, and payment for continuing expenditures, including claims supervision, is treated later in this Order.

## AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

█ Having fully considered the elements discussed above, both individually and in the context of the instant litigation with its attendant circumstances, we find that plaintiffs' counsel are entitled to receive and hereby are awarded as legal fees for their legal services on behalf of the class in this action, a sum equal to twenty percent (20%) in cash of any recovery to the Royal investors, and twenty percent (20%) in cash and twenty percent (20%) in stock in the reorganized IARF, but in the event IARF is not reorganized twenty percent (20%) of the liquidated value of IARF;

twenty percent (20%) from all remaining settlements (plus any net income which may accrue with respect to said sum of cash and said shares prior to distribution thereof to counsel). This determination is based upon the following specific findings:

| Settlement No. | Benefit to Class Based on Present Worth | Fees to be Paid To Class Counsel |
|---|---|---|
| 1 | $ 9,500,000 | $1,900,000 |
| 2 | 2,060,000 | 412,000 |
| 3 | 63,086 | 12,617.20 |
| 4 | --- | --- |
| 5 | 20,183 | 4,036.60 |
| 6 | 3,181 | 636.20 |
| 7 | 34,918 | 6,983.60 |
| 8 | 283,333 | 56,666.66 |
| 9 | 17,305 | 3,461.00 |
| 10 | 575,000 | 115,000 |
| 11 | 25,000 | 5,000 |
| 12 | 700,000 | 140,000 |
| Total present worth to the Class | $13,282,006 | |
| Total Attorney fees to be paid to class counsel | | $2,656,401.26 |

Further, class counsels' request for permission to apply at some future date for attorneys' fees and costs in connection with any benefit to the class from Settlement # 4 (Midbar) and from representation of the class in the American Employers' litigation (Civil Action No. 74–F–1143) is hereby granted.

The foregoing findings as to the benefits conferred to the class and the attorneys' fees hereby awarded does not mean that the attorneys' fees must be paid from any particular source. This Order, insofar as it awards attorneys' fees and costs which must necessarily be satisfied in part from the 12½% share of the IARF estate beneficially owned by the *Bottger* Class (under the terms of the Conditional Allocation Agreement dated September 25, 1975, which was previously approved by this Court and by the Reorganization Court) does not direct, nor shall any further order issued by this Court direct Trustee Frison to pay over any portion of the IARF estate as attorneys' fees or costs. When 12½% of the IARF estate has been delivered to the Registry of this Court as part of the final distribution of the IARF estate assets, either pursuant to an approved, confirmed, and consummated plan of reorganization or pursuant to proceedings in bankruptcy liquidating IARF, the balance of any award of fees and costs hereunder shall be satisfied from and shall apply only to that 12½% of the IARF estate so paid over as the share of the class.

Also, as to costs to be reimbursed to plaintiffs, the Court hereby determines that 80% of the $289,000 in costs should be paid by *Bottger* IARF investors, and twenty percent (20%) by *Bottger* Royal investors, such determination being made on the basis of the ratio of total benefits conferred upon IARF and Royal investors, respectively.

Since the Court feels it is proper that class counsel be repaid the costs disbursed promptly and be paid attorneys' fees as soon as practicable, and yet the Court is aware that there may be some delay before this Court actually receives the deposit from Theodore H. Frison, Trustee of IARF, in cash or stock, of 12½% of the assets of the IARF estate, and the Court being advised that some cash is presently available, for payment to class counsel in accordance with this Order, the Court determines that:

(a) The balance now due to Class counsel for costs, $72,372.15 to Bader & Dufty and $66,347.46 to Landy & Spector, should be paid immediately.

(b) The attorneys' fees awarded by this Order shall be paid within ten (10) days to the extent cash is then available, and thereafter, within ten (10) days from the date of the deposit of any additional settlement proceeds.

The Court is presently advised that there is on deposit $107,500 plus interest with the United Bank of Skyline, which funds represent the proceeds of Settlements # 3, 5, 6 and 7. The escrow agents are directed to pay these funds over within ten (10) days from receipt of this Order. The Court is further advised there is on deposit the sum of $20,464.04, representing the balance from the $50,000 originally deposited by CNA as an advance on the costs of this Court's Notice of March 31, 1976. Such funds shall be paid over within ten (10) days also. Finally, the Court is advised that RRC has on hand cash in excess of $600,000 and will soon have an additional $300,000 on hand, the NOPI proceeds from the sale of certain assets. Since it appears that the total fees and costs to be paid by Royal investors in the *Bottger* class will exceed $550,000, RRC is directed to pay over within ten (10) days the sum of $450,000 to class counsel, the balance to be paid within ten (10) days after an accounting from class counsel of all payments of costs and fees, heretofore and hereafter to be paid to them, is received by the Court. All cash proceeds from all settlements, except Settlement # 1, are to be paid over to the class counsel within ten (10) days from deposit with the Clerk of this Court. Any balance due thereafter shall be paid from the 12½% of IARF estate within ten (10) days after deposit thereof by Trustee Frison. No payments are to be made from such 12½% or from Frison prior to final determination of the Reorganization Court of the final disposition of the IARF estate.

The settlement realized in this litigation is of considerable importance. Plaintiffs' counsel have assiduously, consistently and indefatigably protected the rights of the class. The partial settlements were not easily attained. Class claims against remaining defendants have been preserved.

The class members have been immeasurably and financially benefitted from the services rendered by counsel. The services were of the highest and conscientious order. The award, while substantial, is reasonable, fair and rightfully deserved.

The foregoing award of fees and disbursements shall constitute an interim allowance to be made for legal services rendered and disbursements made on behalf of the class in this action. Class counsel are granted permission to apply in the future for fees and costs in connection with their participation in the claims procedure, and as stated above, in the *American Employers'* litigation and the Midbar venture.

Counsel for plaintiffs are directed to prepare a judgment awarding attorney fees and expenses as reflected herein; all in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure. Said judgment shall be filed expeditiously.

The Court expressly retains jurisdiction to construe, administer and enforce the partial settlements in accordance with its Final Judgments entered herein February 20, 1976, and June 14, 1976, including the allowance and disallowance of claims filed herein by members of the class; and expressly retains jurisdiction to construe, administer and enforce the provisions of this Order and Final Judgment entered herein.

The award of attorney fees in the instant case is decided on the totality of the circumstances of the case and the uniqueness of the litigation and is not precedent for other awards of attorney fees in other class actions. The ruling is limited to the facts of this case.

This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.